894 A.2d 563

**RITE AID CORPORATION**

v.

**Ellen R. LEVY–GRAY.**

**No. 61, Sept. Term, 2005.**

Court of Appeals of Maryland.

March 13, 2006.

Melvin J. Sykes (James A. Rothschild, Michael J. Carlson, Anderson, Coe & King, LLP, Baltimore, on brief), for petitioner.

Craig Franco (Odin, Feldman & Pittleman, P.C., Fairvax, VA), Loyd Byron Hopkins (Loyd Byron Hopkins, P.C., Frederick), all on brief, for respondent.

Steven P. Benson, O'Brien, Butler, McConihe & Schaefer, Washington, DC, Susan C. Winckler, American Pharmacists Assn., Washington, DC, amicus brief for Nat. Assn. of Chain Drug Stores, Inc. & American Pharmacists Assn. in support of petitioner.

Mary Ellen Fleck, Don L. Bell, Nat. Assn. of Chain Drug Stores, Inc., Alexandria, VA, of counsel.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

In the case *sub judice*, a jury returned a verdict against Rite Aid Corporation, the petitioner, for breach of express warranty based on a package insert that it generated and provided with a prescription pharmaceutical, doxycycline, directing the respondent, Ellen Levy–Gray, to "take with food or milk if upset stomach occurs." Because, based on the facts of the instant case, we determine that the jury reasonably could infer that the language "take with food or milk if upset stomach occurs" constitutes an express warranty under Maryland Code (1975, 2002 Repl.Vol.), Section 2–313 of the Com-

mercial Law Article, we affirm the judgment of the Court of Special Appeals.

### Background

On October 25, 2000, Dr. Ronald Geckler, the head of Infectious Diseases at Mercy Medical Center, diagnosed Ms. Levy–Gray with Lyme disease and gave her a prescription for doxycycline, a drug that is part of the group of Tetracycline-based drugs.[1] Dr. Geckler informed Ms. Levy–Gray that while taking doxycycline she could not continue nursing her son, but provided no other instructions as to how she should take the doxycycline. Ms. Levy–Gray filled her prescription at the Rite Aid Pharmacy # 4465, located at 12224 Tullamore Road, in Timonium, Maryland, which she stated she chose because of prior dealings with that store as well as the fact that Rite Aid was a national chain of pharmacies. Rite Aid obtained the doxycycline at issue from Watson Laboratories, Inc. of Corona, California (Watson), which is not a party to this action. Watson shipped the doxycycline in bottles containing 500 capsules and included an eight-page pamphlet which the manufacturer had submitted to the United States Food and Drug Administration (FDA) and which had been approved by that agency as "labeling" for that prescription drug. The pamphlet from Watson provided in pertinent part:

If gastric irritation occurs, it is recommended that doxycycline be given with food or milk.

The doxycycline received by Ms. Levy–Gray was accompanied by an instruction and information pamphlet, known as a "patient package insert" (PPI), entitled "Rite Advice." The "Rite Advice" pamphlet was drafted for Rite Aid by First Data Bank Corporation, which is not a party to the case *sub judice*. The cover page of the pamphlet informed readers: "Inside is everything you need to know about your prescription. It covers everything in writing from dosage to side

---

1. Tetracycline is "a yellow crystalline broad-spectrum antibiotic $C_{22}H_{24}N_2O_8$ produced by streptomyces or synthetically." Merriam–Webster's Collegiate Dictionary, 1219 (10th ed.1999).

effects. If you have any questions, just ask your pharmacist." The inside of the pamphlet stated, in part:

IMPORTANT NOTE: THE FOLLOWING INFORMATION IS INTENDED TO SUPPLEMENT, NOT SUBSTITUTE FOR, THE EXPERTISE AND JUDGMENT OF YOUR PHYSICIAN, PHARMACIST OR OTHER HEALTHCARE PROFESSIONAL.

IT SHOULD NOT BE CONSTRUED TO INDICATE THAT USE OF THE DRUG IS SAFE, APPROPRIATE, OR EFFECTIVE FOR YOU.

CONSULT YOUR HEALTHCARE PROFESSIONAL BEFORE USING THIS DRUG.

\* \* \*

HOW TO TAKE THIS MEDICATION: Take each dose with a full glass of water (4 oz. or 120 ml) or more. Do not lie down for at least 1 hour after taking this drug. Take with food or milk if stomach upset occurs unless your doctor directs you otherwise. Avoid taking antacids, containing magnesium, aluminum or calcium, sucralfate, iron preparations or vitamin (zinc) products within 2–3 hours of taking this medication. These products bind with the medication preventing its absorption. . . .

\* \* \*

The information in this leaflet may be used as an educational aid. This information does not cover all possible uses, actions, precautions, side effects, or interactions of this medicine. This information is not intended as medical advice for individual problems[.]

Ms. Levy–Gray took the first dose of doxycycline on October 26 with water. According to Ms. Levy–Gray's testimony, the following day she started taking the medication with milk because she had experienced an upset stomach. While continuing to take the drug, Ms. Levy–Gray also consumed a large quantity of dairy products including eight to ten glasses of milk per day, macaroni and cheese, grilled cheese sandwiches, yogurt, ice cream, and cottage cheese, as she testified, in an effort to maintain her breast milk to resume nursing her

son after her treatment ended. During this time, according to Ms. Levy–Gray's testimony, she experienced no alleviation of her symptoms from Lyme disease.

Upon advice from her brother, a urological oncologist, Ms. Levy–Gray stopped taking the doxycyline with dairy products. Although Ms. Levy–Gray's symptoms improved within two or three days of discontinuing consumption of dairy products in conjunction with the doxycycline, she did not fully recover and was referred by Dr. Christine Lafferman, her internist, to Dr. Charles A. Haile, the Chief of Medical Staff and Chief of the Division of Infectious Diseases at Greater Baltimore Medical Center, who is board certified in internal medicine and infectious diseases. Ms. Levy–Gray met with Dr. Haile on December 28, 2000. When a second six-week course of doxycycline failed to ameliorate Ms. Levy–Gray's symptoms, Dr. Haile diagnosed her with post-Lyme syndrome, which is a chronic autoimmune response in which patients experience symptoms that mimic Lyme disease without an active bacterial infection.

On November 2, 2001, Ms. Levy–Gray filed a complaint in the Circuit Court for Baltimore County against Rite Aid seeking relief based on the theories of negligence, product liability, failure to warn, negligent misrepresentation, and breach of express warranty. Her husband asserted a claim for loss of consortium.[2] Ms. Levy–Gray alleged that her consumption of milk and other various dairy products while taking the doxycycline, consistent with the information provided by Rite Aid, reduced the absorption of the drug and prevented it from operating as effectively as possible, thereby proximately causing her post-Lyme syndrome.

On December 10, 2001, Rite Aid filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted because the statements contained in the "Rite Advice" pamphlet did not constitute an express warranty and the fact that the particular Rite Aid store involved in

---

2. Ms. Levy–Gray's husband is not a party to the proceedings before this Court.

the case was not a proper party to the suit. The court granted the motion with respect to the Rite Aid store and denied the motion regarding the express warranty issue on February 25, 2002. Rite Aid thereafter filed a motion for summary judgment arguing that it could not be held liable under negligence, strict liability or breach of express warranty under the facts of the case *sub judice*. On January 10, 2003, the trial judge denied the motion. Ms. Levy–Gray subsequently filed an amended complaint, which increased the *ad damnum* clause for compensatory damages to $2,500,000 and added a claim for $8,000,000 in punitive damages.

On May 20, 2003, the trial in the Circuit Court of Baltimore County before Judge John F. Fader II commenced and lasted seven days, wherein the jury heard copious testimony from expert witnesses called by both parties. Rite Aid's experts testified that the absorption of doxycycline might have been reduced by up to twenty percent when taken with milk or other dairy products, but that the reduction was clinically insignificant because the recommended dosage provided more of the drug than was necessary to treat the infection. Conversely, Ms. Levy–Gray's experts testified that doxycycline should not have been taken with dairy products and that Ms. Levy–Gray's consumption of milk with her medication caused her continued Lyme disease symptoms.

At the close of evidence, Judge Fader permitted the case to go to the jury on the theories of negligence and breach of express warranty and dismissed the remainder of the claims. The court presented the jury with the following instructions:

> An individual or an entity may only be sued for negligence if that individual or entity had a duty to another person which the defendant breached. That duty may be imposed by statute: automobile negligence case, follow the rules of the road; or by case law, or by volunteering to assume a duty. It is the Plaintiffs' contention in this case that Rite Aid had a duty to her because it assumed that duty by giving prescription advice to her. One who volunteers to assist or aid another must exercise the same degree of case a reason-

able person would exercise under the same or similar circumstances.

Rite Aid gave her that pamphlet. The law says that a volunteer who assumes a duty has a responsibility to use reasonable care in fulfilling that duty. Negligence is what she alleges, saying that they had a duty because they volunteered, they breached that duty. Rite Aid says we did not breach that duty. The conflict in the evidence is for you to resolve.

Negligence is doing something that a person using reasonable care would not do or not doing something that a person using reasonable care would do. Reasonable care means that caution, attention, or skill a reasonable person would use under similar circumstances.

Thus the first question alleging negligence. Do you find in favor of Rite Aid, do you find in favor of Ellen R. Levy–Gray.

There is also a cause of action for express warranty, again, focusing on the Rite Aid advice. That is the contract type of action. An express warranty is a representation about a product by the seller to a buyer when the buyer relies upon the representation in purchasing the product. Any statement of fact made by the seller to the buyer about the product is an express warranty that the product conforms to the statement or promise made. The promise or statement may be oral or in writing. No particular words are necessary to create an express warranty, nor is it necessary that the seller use formal words such as warranty or guarantee or that the seller have a specific intention to make a warranty.

The attorneys are going to talk to you about that Rite Aid Rite Advice pamphlet. The Plaintiffs are going to say and argue to you that this constituted an express warranty. The Defendants are going to refer to the same paper and argue to you that it did not.

You will see the pamphlet, the warranty, and listen to the differences of opinion, factual and expert witnesses and then

we ask you to answer this second question alleging breach of warranty: Do you find in favor of Rite Aid Corporation or in favor of Ellen R. Levy–Gray.

The jury found in favor of Rite Aid on the negligence claim and found in favor of Ms. Levy–Gray with respect to the breach of express warranty claim in the amount of $250,000. After the Circuit Court denied Rite Aid's post-judgment motions including a motion for judgment n.o.v., Rite Aid filed a notice of appeal with the Court of Special Appeals seeking review of the jury's determination that it was liable for breach of express warranty, and Ms. Levy–Gray filed a cross-appeal premised upon her assertion that the trial court erred in failing to give the jury an instruction on Rite Aid's failure to warn her about the contraindication of doxycycline and calcium containing products.

In a published opinion, the Court of Special Appeals determined that Ms. Levy–Gray established reliance on the information contained in the "Rite Advice" pamphlet due to her course of dealing with the pharmacy and her continued confidence in Rite Aid to provide facts concerning her prescription that were not furnished by her physician. *Rite Aid Corporation v. Levy–Gray,* 162 Md.App. 673, 691–92, 876 A.2d 115, 126 (2005). Moreover, the Court of Special Appeals held that the statement in the "Rite Advice" pamphlet stating that doxycycline should be taken with food or milk in the event of upset stomach is a representation that a characteristic of doxycycline is that it is compatible with food or milk. The intermediate appellate court concluded that the issue of whether the general disclaimer accompanying the information in the "Rite Advice" pamphlet took doxycycline's compatibility with dairy out of the bargain was a question of fact for the jury to decide. The Court of Special Appeals also held that Ms. Levy–Gray did not have to be aware of the express warranty at the time of her purchase from Rite Aid for the warranty to be effective. Thus, the court determined that Rite Aid expressly warranted that doxycycline could be taken with milk without altering the drug's efficacy. Based on its analysis of the issues presented by Rite Aid, the Court of Special Appeals concluded that it did

not have to address the question raised by Ms. Levy–Gray in her cross-appeal.[3]

On July 18, 2005, Rite Aid filed a petition for writ of certiorari with this Court and presented the following questions for our review:

    1.  Whether a pharmacy can be held liable on a theory of express warranty for information and advice furnished with a prescription drug.

    2.  Whether instructions on how to use a product, delivered to the customer after the product is paid for, which the customer is unaware of prior to the sale and which makes no promise of the product's performance, fulfills the requirements for an express warranty under Section 2–313 of Maryland's Commercial Law Article that the statement be "an affirmation of fact or promise made by the seller that relates to the goods" and that the affirmation be "part of the basis of the bargain."

On September 8, 2005, we granted the petition and issued the writ. *Rite Aid v. Levy–Gray,* 388 Md. 673, 882 A.2d 286 (2005). We conclude that under the facts present in the case at bar, Rite Aid may be held liable for breach of express warranty. Moreover, we determine that, under the circumstances of the case *sub judice,* the jury reasonably could infer that the instruction "take with food or milk if upset stomach occurs" in the "Rite Advice" pamphlet constitutes an express warranty under Maryland Code (1975, 2002 Repl.Vol.), Section 2–313 of the Commercial Law Article. Therefore, we affirm the judgment of the Court of Special Appeals.

### *Discussion*

Rite Aid argues that the statements contained in the "Rite Advice" pamphlet cannot be part of the basis of the bargain because the decision to purchase the doxycycline was based solely on the advice of Ms. Levy–Gray's prescribing physician

---

3.  Ms. Levy–Gray did not file a cross-petition for writ of certiorari with this Court.

and that it is protected from liability due to the "learned intermediary" doctrine, which governs the relationship between physicians, patients, and pharmacists. Rite Aid also contends that the statements about doxycycline contained in the "Rite Advice" pamphlet were not part of the basis of the bargain because Ms. Levy–Gray did not receive them and was not aware of their existence until after the sale was completed. Rite Aid asserts that the advice to take doxycycline with milk if the stomach is upset unless otherwise directed by a physician is not an affirmation about the drug that can give rise to an express warranty because it was not a statement that use with milk was invariably appropriate for all consumers.

Conversely, Ms. Levy–Gray contends that the statements contained in the "Rite Advice" pamphlet were part of the basis of the bargain because of her previous course of dealing with Rite Aid and her reliance on the information that she received from Rite Aid. Ms. Levy–Gray also argues that the advice to "[t]ake with food or milk if stomach upset occurs unless your doctor directs you otherwise" is an affirmation that doxycycline is compatible with milk and can give rise to an express warranty. She asserts that Rite Aid not only warranted that doxycycline was compatible with milk, but also expressly warranted the completeness and correctness of its information and advice contained in the "Rite Advice" pamphlet.

### Can Rite Aid Be Held Liable for Breach of Express Warranty

The threshold issue that we must address is Rite Aid's argument that the sale of pharmaceuticals is qualitatively different from the sale of other goods, such that pharmacies cannot be held liable for breach of express warranties under the Uniform Commercial Code. Although courts in our sister jurisdictions consistently have declined to impose the Uniform Commercial Code implied warranties of fitness [1] and mer-

---

4. Maryland Code (1975, 2002 Repl.Vol.), Section 2–315 of the Commercial Law Article describes an implied warranty of fitness for a particular purpose as arising:

chantability [5] because they have determined that the prescribing of medication is an aspect of the delivery of medical services, *see Elsroth v. Johnson & Johnson,* 700 F.Supp. 151 (S.D.N.Y.1988); *Coyle v. Richardson–Merrell, Inc.,* 526 Pa. 208, 584 A.2d 1383 (1991); *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 (1985), Rite Aid has failed to produce a single case that stands for the proposition that pharmaceuticals may not be the subject of an express warranty. "What differentiates [a] promise implied by law[, i.e., an implied warranty,] . . . and an express warranty is that the 'standard of performance is set by the defendants' promises, rather than imposed by law.'" *Coca–Cola*

---

(1) Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select and furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

5. Maryland Code (1975, 2002 Repl.Vol.), Section 2–314 of the Commercial Law Article described an implied warranty of merchantability as:

(1) Unless excluded or modified (§ 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. Notwithstanding any other provisions of this title.

(a) In §§ 2–314 through 2–318 of this title, "seller" includes the manufacturer, distributor, deal, wholesaler or other middleman or the retailer; and

(b) Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer.

(2) Goods to be merchantable must be at lease such as

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purpose for which such goods are used; and

(d) Run, within the variation permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

*Bottling Co. of Cape Cod v. Weston & Sampson Engrs., Inc.,* 45 Mass.App.Ct. 120, 695 N.E.2d 688, 694 (1998) quoting *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engrs., Inc.,* 396 Mass. 818, 489 N.E.2d 172, 175 (1986); *see also Housing Authority of Portland v. Ash Nat'l,* 36 Or.App. 391, 584 P.2d 776, 778 (1978) (stating that an implied warranty "is a 'curious hybrid' between tort and contract law" and differs from express warranties based on contract); Md.Code (1975, 2002 Repl.Vol.), § 2–313, official cmt. 1 ("Express warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in a form are repugnant to the basic dickered terms. 'Implied' warranties rest so clearly on a common factual situation or set of conditions that no particular language or action is necessary to evidence them and they will arise in such a situation unless unmistakably negated.").

■■ A prescription drug satisfies the definition of "goods" as explicated in Maryland Code (1975, 2002 Repl.Vol.), Section 2–105 of the Commercial Law Article, which provides in pertinent part:

(1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 8) and things in action.

Prescription drugs are "movable at the time of identification to the contract for sale." Moreover, there is no reasonable basis upon which to distinguish between prescription drugs and other goods under the Uniform Commercial Code with respect to express warranties. Thus, because drugs are goods subject to sale, they may potentially be the subject of an express warranty. *See, e.g., Batiste v. American Home Prods. Corp.,* 32 N.C.App. 1, 231 S.E.2d 269 (1977) (holding that a drug manufacturer's sale of drugs to a plaintiff would fall within the purview of the UCC). Therefore, in light of the absolute lack of authority for distinguishing between prescription drugs and other goods for express warranty purposes, we conclude that

we are not precluded as a matter of law from affirming the jury's verdict against Rite Aid on the basis of breach of express warranty.

Rite Aid, nevertheless, primarily relies on *Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir.1969), in which the United States Court of Appeals for the Second Circuit upheld the trial court's refusal to submit a breach of express warranty claim to the jury because the plaintiff did not adduce evidence that the defendant "represent[ed] either (1) that its drugs were free from all harmful side effects or (2) that its drugs were absolutely harmless." *Id.* at 428. *See also In re Diet Drugs Prods. Liability Litigation*, 328 F.Supp.2d 791, 818 (N.D.Ohio 2004) (granting summary judgment in favor of defendants because the general statement that product is "safe and effective" does not give rise to an express warranty); *Rohrbough v. Wyeth Labs., Inc.*, 719 F.Supp. 470, 477–78 (N.D.W.V.1989) (granting summary judgment in favor of defendant and holding that statement that side effects are "exceedingly rare" is not an express warranty); *Whittington v. Eli Lilly and Co.*, 333 F.Supp. 98 (S.D.W.V.1971) (granting manufacturer's motion for summary judgment and finding no express warranty as to the absolute effectiveness of the drug); *Butler v. The Travelers Ins. Co.*, 202 So.2d 354, 356 (La.App. 1967) (upholding trial court's rendering of summary judgment on behalf of manufacturer and declining to find breach of express warranty where there was no representation that the tetanus vaccine would absolutely prevent tetanus). These cases involved a determination based on the idiosyncratic facts of each case and do not support the proposition that there can never be an express warranty with respect to prescription drugs.

### *The Statement at Issue Constituted An Express Warranty*

Maryland Code (1975, 2002 Repl.Vol.), Section 2–313 of the Commercial Law Article governs "express warranties by affirmation, promise, description, [or] sample," and provides in pertinent part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

*    *    *

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Official Comment 3 to Section 2–313 further elaborates:

3. The present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

Moreover, Official Comment 7 also elucidates the law governing the case *sub judice:*

7. The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional

assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order.

▮ In the case *sub judice,* Ms. Levy–Gray alleges that the language "take [doxycycline] with food or milk if stomach upset occurs unless your doctor directs you otherwise" constitutes an affirmative statement by Rite Aid that the doxycycline is compatible with the simultaneous consumption of milk or other dairy products, which constitutes an express warranty. Conversely, Rite Aid asserts that the information at issue cannot be considered an express warranty because it is derived from the FDA-approved language developed by the manufacturer of the doxycycline and was presented with the statement that "it should not be construed to indicate that use of the drug is safe, appropriate, or effective for you."

The similarity between Rite Aid's advice and that of Watson does not preclude Rite Aid's statement from constituting a warranty on its part. The language was Rite Aid's, and it was in no way attributed to Watson. Ms. Levy–Gray would necessarily assume that the advice was entirely that of Rite Aid. The jury reasonably could infer that Rite Aid represented to Ms. Levy–Gray that the doxycycline was compatible with milk consumption.

▮ Moreover, we decline to hold that a general disclaimer would preclude any express warranty in this case as a matter of law, because a reasonable consumer could conclude that the general statement did not negate the effect of the more specific assertion as to the administration of the doxycycline when the entire document is read as a whole. From the language of the "Rite Advice" pamphlet, the jury could reasonably infer from the evidence introduced that the phrase "take with food or milk if upset stomach occurs," although not guaranteeing effectiveness, affirmed that milk would not adversely impact the efficacy of the drug. The issue of fact concerning the interplay between the general disclaimer and the administration instruction was properly before the jury and we must give deference "to the inferences a fact-finder

may draw." *State v. Smith,* 374 Md. 527, 534, 823 A.2d 664, 668 (2003).

■■ An affirmation of fact must become "part of the basis of the bargain" for the statement to be considered an express warranty. The term "bargain" is not defined in the Uniform Commercial Code, but is itself used in the definition of "agreement" in Maryland Code (1975, 2002 Repl.Vol.), Section 1–201(3) of the Commercial Law Article, which provides in pertinent part:

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in Titles 1 through 10 of this article.

Rite Aid argues that for an affirmation to become "part of the basis of the bargain," the affirmation must be a negotiated term of the agreement, or the consumer must at least have been aware of its existence prior to the consummation of the deal. Based on the circumstances surrounding most purchases in modern commercial dealing, we disagree.

■ Official Comment 7 to Section 2–313 provides, "[t]he precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language ... [is] fairly to be regarded as part of the contract." Md.Code (1975, 2002 Repl.Vol.), § 2–313 official cmt. 7 of the Commercial Law Article. The clear implication of Official Comment 7 is that express warranties may be formed prior to the completion of the sale or even after the sale has been consummated. What is paramount is the relationship between the sale of the goods and the affirmations made by the seller. Various commentaries on the Uniform Commercial Code have similarly recognized the reality that warranties are often given at the time of the sale such that the buyer does not become aware of their terms until after the sale is finished:

> As it is common knowledge that sellers will deliver written warranties after the contract has been made, some courts

are recognizing that later statements found in these writings are part of the basis of the bargain.

3 Lary Lawrence, *Anderson on the Uniform Commercial Code,* § 2–313:66 at 60 (3d ed.2002); *see also* James J. White & Robert S. Summers, *Uniform Commercial Code,* § 9–5 at 354–55 (5th ed.2000).

We agree with the analysis explicated in *Murphy v. Mallard Coach Co.,* 179 A.D.2d 187, 582 N.Y.S.2d 528 (N.Y.App. Div.1992), in which the court rejected an argument identical to that presented by Rite Aid:

> [W]e believe that while the warranty was technically handed over *after* plaintiffs paid the purchase price, the fact that it was given to plaintiffs at the time they took delivery of the motor home renders it sufficiently proximate in time so as to fairly be said to be part of the basis of the bargain (*compare,* UCC 2–313, comment 7; 1 White and Summers, Uniform Commercial Code, § 9–5 at 448–455 [3d ed.]; *cf., Marine Midland Bank v. Carroll,* 98 A.D.2d 516, 471 N.Y.S.2d 409). To accept the manufacturer's argument that in order to be part of the basis of the bargain the warranty must actually be handed over during the negotiation process so as to be said to be an actual procuring cause of the contract, is to ignore the practical realities of consumer transactions wherein the warranty card generally comes with the goods, packed in the box of boxed items or handed over after purchase of larger, non-boxed goods and, accordingly, is not available to be read by the consumer until after the item is actually purchased and brought home. Indeed, such interpretation would, in effect, render almost all consumer warranties an absolute nullity.

*Id.* at 531.

This position also was adopted by the United States District Court for the Southern District of Indiana in *In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litigation,* 205 F.R.D. 503 (S.D.Ind.2001), *rev. on other grounds,* 288 F.3d 1012 (7th Cir.2002). Specifically, the court noted, in basing its

conclusion on Official Comment 7 to Section 2–313 of the Uniform Commercial Code:

The official comments to U.C.C. § 2–313 support this holding. Official Comment 7 provides:

The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract.

A buyer certainly cannot prove that she relied upon an affirmation made after the closing of the deal in deciding whether to consummate the deal; however, the U.C.C. clearly contemplates that such post-sale affirmations can be enforced as warranties, as long as they are "fairly to be regarded as part of the contract."

*Id.* at 527 (citations omitted). Moreover, the court determined that the interpretation urged by the defendants in *In re Bridgestone/Firestone*, and by Rite Aid before this Court, " 'would, in effect, render almost all consumer warranties an absolute nullity,' inasmuch as it is common practice for warranty booklets to be provided to consumers inside the sealed box in which a product is packaged, or, in the case of vehicles, in the glove box of a new car upon delivery." *Id.* at 527 n. 31 (citation omitted).

This view was the basis for the Superior Court of Pennsylvania's reversal of the entry of summary judgment in favor of the seller in an action for breach of warranty for a used truck in *Weiss v. Keystone Mack Sales, Inc.*, 310 Pa.Super. 425, 456 A.2d 1009 (1983). The trial court's grant of summary judgment was premised upon a warranty-exclusion clause, which was prominently displayed on the purchase order, and provided:

THIS TRUCK SOLD "AS IS," "WHERE IS." NO WARRANTY OR GUARANTEE IS OFFERED OR IMPLIED.

*Id.* at 1010. In the buyer's answer to the seller's interrogatories, however, he alleged that the salesman had orally advised him that the truck was the "best-running truck that Keystone Mack had purchased from [its supplier], and ... that ... [it]

was in excellent condition." *Id.* The buyer also introduced into evidence a handwritten note on a repair order that he received following the vehicle's purchase stating: "30 day warranty 50/50 on the 250 Cummins engine. If a problem develops have the truck brought back to us. We certify that the engine is in excellent running condition." *Id.*

Addressing the seller's conduct in attempting to make repairs after the truck's purchase, the court stated:

> Also, the lower court confined its view of the case to the purchase order. The record suggests, however, that the events on which appellant's claim is based did not end with the signing of the purchase order. As we have discussed, when appellant complained that the engine was emitting smoke, appellee undertook to repair it, and gave appellant a "30 day warranty 50/50" on the engine, and "certif[ied]" that the engine was "in excellent running condition." Then, when it was discovered that the engine had in fact a cracked block, appellee replaced it, taking some sixty-seven days to do so. It is by no means clear—and the lower court did not consider—whether appellee's conduct subsequent to the execution of the purchase order resulted in a new contractual or warranty obligation coming into being, either as a proper modification of the purchase order, or as an obligation created later than and distinct from the purchase order.

Id. at 1012. Thus, the court recognized that express warranties may arise after the contract for sale is consummated.

In *Bigelow v. Agway*, 506 F.2d 551 (2d Cir.1974), the United States Court of Appeals for the Second Circuit considered the issue of whether warranties made after a sale is completed may become a basis of the bargain. In *Bigelow*, a farmer sued the manufacturer and distributor of a chemical used to treat hay before baling. Although the record before the court reflected that most farmers would not bale hay that had a moisture level higher than twenty to twenty-five percent, two months after the sale and use of the chemical, the defendant's salesman guaranteed that hay treated with the chemical was safe to bale even if it contained a moisture level of thirty-two

to thirty-four percent. The farmer baled the hay, and the level of moisture contributed to a fire that destroyed his entire crop. The Second Circuit, rejecting the defendant's argument that the salesman's representation after the sale was not part of the basis of the bargain, noted:

> Although defendants might conceivably contend that since [the salesman's] representation postdated the delivery of the [chemical] . . . and therefore could not be the "basis of the bargain" as required for recovery . . ., it is undisputed that the [salesman's] visit . . . was to promote the sale of the product. Thus they might constitute an actionable modification of the warranty.

*Id.* at 555 n. 6. *See also Downie v. Abex,* 741 F.2d 1235, 1240 (10th Cir.1984) (noting that "a rational jury could have found that GM's post-sale representations about the safety of ball-screw assemblies with yolk deflectors were designed to promote future sales . . . [because] GM sent Abex brochures discussing the safety features for distribution to Abex's customers."); *Glyptal Inc. v. Engelhard Corp.,* 801 F.Supp. 887, 895 (D.Mass.1992) (holding that a telephone conversation in which the defendant's service representative made affirmations concerning the comparable quality of substituted goods that occurred post-sale could constitute an express warranty); *Phillips Petroleum Co. v. Bucyrus–Erie Co.,* 131 Wis.2d 21, 388 N.W.2d 584, 590 (1986) (concluding that incorporation into approval drawings, after sale, of specification of grade of steel, created express warranty by modification of original contract); *Jones v. Abriani,* 169 Ind.App. 556, 350 N.E.2d 635, 644–45 (1976) (determining that promises made to buyers of mobile home after contract of purchase was signed, including promise that all defects would be repaired, amounted to express warranty); *Winston Indus., Inc. v. Stuyvesant Ins. Co., Inc.,* 55 Ala.App. 525, 317 So.2d 493, 496–97 (1975) (holding that express warranty existed despite fact that buyer did not receive copy of the manufacturer's warranty with the sale and had no knowledge of its terms).

Rite Aid attempts to distinguish these cases by arguing that the warranties were expressly labeled as such and that the

warranties were actually remedial promises under Official Comment 11 to Section 2–313, which provides in pertinent part:

A promise about the quality or performance characteristics of the goods creates an express warranty if the other elements of a warranty are present whereas a promise by which the seller commits itself to take remedial action upon the happening of a specified event is a remedial promise. The distinction has meaning in the context of the statute of limitations.

\*      \*      \*

The concept of remedial promise is dealt with in a separate subsection to make clear that it is a concept separate and apart from express warranty and that the elements of an express warranty, such as basis of the bargain, are not applicable.

3 Lary Lawrence, *Anderson on the Uniform Commercial Code,* § 2–313:339 (3d ed. Supp.2005).

■ We are not persuaded by Rite Aid's argument. Under the plain language of Maryland Code (1975, 2002 Repl.Vol.), Section 2–313(2) of the Commercial Law Article, "[i]t is not necessary to the creation of an express warranty that the seller use formal language such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." Thus, the fact that the assertions contained in the "Rite Advice" pamphlet did not include language expressly indicating that the information listed therein was a warranty does not preclude a finding that it gave rise to an express warranty.

Furthermore, Rite Aid's reliance on Official Comment 11 to Section 2–313 of the Uniform Commercial Code, as enunciated in Anderson On The Uniform Commercial Code, is misplaced. The Maryland General Assembly has not adopted Official Comment 11 as part of the Official Comment that accompanies the Uniform Commercial Code in the Commercial Law Article, nor has the Legislature enacted any statute that recognizes "remedial promises" as distinct from express warranties. Moreover, the cases at issue analyze the terms of the written

warranties in terms of express warranties, not "remedial promises." Thus, the reasoning remains persuasive.

Rite Aid also relies on the "learned intermediary" doctrine, which applies to the tripartite relationship between the drug manufacturer, the prescribing physician, and the patient, as supporting the proposition that pharmacists cannot be held liable for the breach of express warranty because the patient is presumed to have relied upon the advice rendered by her physician.

As stated by the Restatement (Third) of Torts, "the traditional rules [are] that drug and medical-device manufacturers are liable only when their products contain manufacturing defects or are sold without adequate instructions and warnings to prescribing and other health-care providers." Restatement (Third) Torts: Products Liability § 6, "Liability of Commercial Seller Or Distributor For Harm Caused By Defective Prescription Drugs And Medical Devices," cmt. a. This principle is further explicated in comment b, which provides in pertinent part:

> The obligation of a manufacturer to warn about risks attendant to the use of drugs and medical devices that may be sold only pursuant to a health-care provider's prescription traditionally has required warnings directed to health-care providers and not to patients. The rationale supporting this "learned intermediary" rule is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy. The duty then devolves on the health-care provider to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can made an informed choice as to therapy.

The "learned intermediary" doctrine has been extended to provide a defense to pharmacies and pharmacists by the courts of other jurisdictions. *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* 220 F.Supp.2d 414, 423 (E.D.Pa.2002); *Moore v.*

*Memorial Hospital of Gulfport,* 825 So.2d 658, 666 (Miss. 2002); *Morgan v. Wal–Mart Stores, Inc.,* 30 S.W.3d 455, 469 (Tex.Ct.App.2000); *Griffith v. Blatt,* 158 Or.App. 204, 973 P.2d 385, 390 (1999); *Johnson v. Walgreen Co.,* 675 So.2d 1036, 1037 (Fla.Dist.Ct.App.1996); *Walker v. Jack Eckerd Corp.,* 209 Ga.App. 517, 434 S.E.2d 63, 67 (1993); *Fakhouri v. K Mart Corp.,* 248 Ill.App.3d 328, 187 Ill.Dec. 927, 618 N.E.2d 518, 521 (1993); *Mazur v. Merck & Co.,* 964 F.2d 1348, 1356 (3d Cir.1992); *Nichols v. Central Merch., Inc.,* 16 Kan.App.2d 65, 817 P.2d 1131, 1133 (1991); *Ferguson v. Williams,* 101 N.C.App. 265, 399 S.E.2d 389, 393 (1991); *Laws v. Johnson,* 799 S.W.2d 249 (Tenn.App.1990); *McKee v. American Home Prods. Corp.,* 113 Wash.2d 701, 782 P.2d 1045, 1050 (1989); *Adkins v. Mong,* 168 Mich.App. 726, 425 N.W.2d 151, 152 (1988); *Ingram v. Hook's Drugs, Inc.,* 476 N.E.2d 881 (Ind. App.1985); *Kinney v. Hutchinson,* 449 So.2d 696, 698 (La.Ct. App.1984).

In support of its position, Rite Aid also relies upon the analysis articulated in *In re Rezulin Prods. Liability Litigation,* 133 F.Supp.2d 272 (S.D.N.Y.2001). Rezulin was a prescription diabetes medication, the use of which gave rise to hundreds of lawsuits against its manufacturer. Sixteen of those actions were consolidated in the United States District Court for the Southern District of New York for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. One of the many issues presented in *In re Rezulin* was whether the pharmacies that had filled the plaintiffs' prescriptions for Rezulin had been fraudulently joined as defendants in an effort to preserve federal diversity jurisdiction. The determination of whether the pharmacies were fraudulently joined turned on whether the plaintiffs could state a "legally sufficient and factually arguable claim for relief" against the pharmacies. *Id.* at 279. Among the various claims asserted against the pharmacies was breach of express warranty. After examining the law of each of the states involved, the court determined that a pharmacy was not liable to the patient for failure to warn because those states either applied, or were expected to adopt in the future, to pharmacies the defense

derived from the "learned intermediary" doctrine. Thus, the court concluded that, because patients rely on their physicians when purchasing a prescription drug, and not on pharmacists, a cause of action based on the breach of an express warranty did not lie. The court explained:

Patients who purchase prescription drugs from pharmacists do not negotiate or bargain with the pharmacists about the suitability of the product. Even assuming a pharmacist were to make a representation about the safety of a particular drug, the representation would not form "part of the basis of the bargain" as required by the [Uniform Commercial Code] because the patient purchases the drug on the basis of discussions with his or her physician. Unlike the buyer-seller relationship in normal sales transactions, the relationship between the patient and the pharmacist is a function of a regulatory system requiring that certain drugs be sold solely by prescription of a physician. It is through the pharmacy that the patient purchases the drug, but in only this sense does the pharmacy function as a "seller." The only representations regarding the intrinsic properties of the drug that form the basis of the buyer's purchase are those of the physician. It is precisely for this reason that the learned intermediary doctrine focuses on communications between the manufacturer and physicians, rather than patients or pharmacies; it is the physicians who make the ultimate decision on whether to prescribe the drug.

*Id.* at 291–92.

As the Court of Special Appeals aptly noted, neither *In re Rezulin* nor *Salisbury v. Purdue Pharma, L.P.*, 166 F.Supp.2d 546 (E.D.Ky.2001), upon which Rite Aid also relies, involve a "patient package insert" prepared by, or on behalf of, the pharmacy and distributed under its name.

We adopted a form of the "learned intermediary" doctrine in *People's Serv. Drug Stores, Inc. v. Somerville*, 161 Md. 662, 158 A. 12 (1932). In that case, the plaintiff filed an action sounding in negligence against a pharmacy that had filled a prescription for capsules, which each contained one-

fourth grain of strychnine along with other ingredients. The theory of the plaintiff's case was that the pharmacists should not have filled the prescription because the strychnine content was excessive. In reversing a judgment in favor of the plaintiff, we stated:

[I]t does not follow, because a physician in a given case is liable, that the druggist who filled the prescription is also liable. It would be a dangerous principle to establish that a druggist cannot safely fill a prescription merely because it is out of the ordinary. If that were done, many patients might die from being denied unusual remedies in extreme cases. Of course this does not mean that pharmacists can safely fill prescriptions calling for doses that are obviously fatal; or that where the doses prescribed appear to be unusual the prescription can be safely filled without inquiry of the physician to make sure there has been no error. There is no evidence that this precaution was not taken in the present case; but, even if it was not, that would be immaterial here, because the result of such inquiry would have been to confirm the prescription, as the physician who wrote it testified that it was his unusual prescription in such cases.

*Id.* at 666–67, 158 A. at 13–14. Although we adopted the "learned intermediary" doctrine in *People's Serv. Drug Stores* with respect to the ordinary pharmacist-patient relationship wherein the pharmacist merely fills the prescription as ordered by the physician, we decline to extend the doctrine to those cases in which the pharmacy is disseminating information concerning the properties and efficacy of a prescription drug. To extend the defense to the facts of the instant case to insulate the pharmacy from the consequences of its affirmative decision to distribute information and instructions contained that provide direction to the patients in a patient package insert is without legal justification. Therefore, we decline to hold as a matter of law that the "learned intermediary" doctrine precludes a pharmacy from being held liable for breach of express warranty when it provides a package insert that could provide the basis for such a warranty.

■ We cannot agree with Rite Aid's proposition that Ms. Levy–Gray relied solely on the expertise of Dr. Geckler, her prescribing physician, to describe the appropriate manner in which to take doxycycline as a matter of law. Dr. Geckler testified that he relied on Rite Aid to provide the necessary information to Ms. Levy–Gray. Based on Dr. Geckler's testimony that he did not provide Ms. Levy–Gray with guidance as to the administration of the doxycycline, the jury reasonably could have inferred that Ms. Levy–Gray similarly relied on the information furnished by Rite Aid with respect to doxycycline's characteristics and how it should be taken. Moreover, the jury further could have inferred from the evidence presented at trial that the language contained in the "Rite Advice" pamphlet encouraged Ms. Levy–Gray to rely on the information contained therein based upon its assertion on the cover that "[i]nside is everything that you need to know about your prescription;" thus, the statement "take with food or milk if upset stomach occurs" had the effect of warranting that for the duration of Ms. Levy–Gray's doxycycline treatment the doxycycline will not be adversely affected by her consumption of milk. Based on the facts of the case *sub judice,* the jury reasonably could have inferred that Ms. Levy–Gray relied on the veracity of Rite Aid's affirmation each time she took the dose of doxycycline with milk.

### *Conclusion*

■ We determine that under the facts of the case at bar, pharmacies may be held liable for breach of express warranty under the Uniform Commercial Code. Furthermore, because we conclude that a jury reasonably could infer that Ms. Levy–Gray relied on the instruction "take with food or milk if upset stomach occurs" as an affirmation that doxycycline is compatible with dairy such that it became part of the basis of the bargain, and that therefore, the statement constituted an express warranty under Maryland Code (1975, 2002 Repl.Vol.), Section 2–313 of the Commercial Law Article, we affirm the judgment of the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.*

RAKER and HARRELL, JJ. Dissent.

Dissenting Opinion by HARRELL, J. which RAKER, J., Joins.

After searching this record in vain to locate a legally cognizable express warranty in Rite Aid's instructions to Ms. Levy–Gray for taking doxycycline, "[t]ake each dose with a full glass of water . . . [or] [t]ake with food or milk if stomach upset occurs unless your doctor directs you otherwise," I respectfully dissent.

#### A.

Sections 2–313(1)(a) and (b) of the Commercial Law Article provide: [1]

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Md.Code (1975, 2002 Repl.Vol.), Commercial Law Article § 2–315(1).[2] To create an express warranty, the seller must affirm a fact, make a promise, or provide a description to the buyer that relates to the goods. That fact, promise, or description must be "part of the basis of the bargain" between the buyer and seller. § 2–313(1)(a) and (b); *see also* Official Comment 1

---

1.  Section 2–313(1)(c) is not relevant to this case.

2.  Unless otherwise provided, all references are to sections of the Commercial Law Article.

("Express warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in a form are repugnant to the basic dickered terms."); 2 ("[T]his section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale...."); 3 ("No specific intention to make a warranty is necessary if any [affirmations of fact by the seller, descriptions of goods or exhibition of samples] is made part of the basis of the bargain."); 7 ("The sole question is whether the language or samples or models are fairly to be regarded as part of the contract.") of § 2–313; *Shreve v. Sears*, 166 F.Supp.2d 378, 420–21 (D.Md.2001) (holding that the instruction for how to switch off a snow thrower provided in the Owner's Manual did not constitute an express warranty because it was not an affirmation regarding the good that became a basis of the bargain, stating that it was "more sensible" to regard the buyer's expectation that the good would work properly as part of an implied warranty of merchantability); *In Re Rezulin*, 133 F.Supp.2d 272, 291–92 (S.D.N.Y.2001) (refusing to hold pharmacies liable for breach of an express warranty because any representation made by the pharmacy would not form part of the basis of the bargain because patients do not purchase prescription medications based on representations from the pharmacy, but rather, based on advice from the prescribing physician). The purpose behind providing liability for breach of an express warranty is to ensure that the buyer gets what the seller promised regarding the goods that induced (or would have induced) the buyer to purchase the goods. *See* § 2–313 (defining express warranty); § 2–714 (providing buyer with damages for breach of warranty); Official Comment 4 to § 2–313 (stating that "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell").

The pharmaceutical instruction for the modality of ingesting doxycycline if upset stomach occurred did not constitute an express warranty because the instructions were not part of the basis of the bargain and may not be said fairly to be part of the contract of sale. This Court has not analyzed before

the "basis of the bargain" requirement of § 2–313(1)(a) and (b). The Majority's interpretation of § 2–313(1) disposes of this statutory requirement all together by its effective holding that an express warranty existed in the instructions contained in an enclosed pamphlet of drug information read by the purchaser after the purchase of the drug, but which would not have been a factor in the decision to buy even had she read it before the sale. The medication instruction, regardless of whether Ms. Levy–Gray knew of it before the purchase, could not have been part of the basis of the bargain between Rite Aid and her because it was neither a dickered term nor part of the contract. Ms. Levy–Gray purchased doxycycline because her doctor advised her to purchase it.[3] Thus, even assuming the instruction was a representation to Ms. Levy–Gray that the intended operative medicinal effectiveness of taking doxy-cycline was compatible with concurrent milk consumption at some level at the time of ingestion of the pill, as the Majority opinion characterizes it, the statement was not a representa-tion that became part of the basis of the bargain as required by § 2–313(1).

A pharmacy should not be subject to liability, at least under a breach of express warranty theory, regarding statements about prescription drugs it dispenses on a doctor's order. As the United States District Court for the Southern District of New York aptly noted in its well-reasoned decision, *In Re Rezulin,* pharmacies do not play the role of retail merchant when selling prescription drugs to patients. *In Re Rezulin,* 133 F.Supp.2d at 291–92 ("Patients who purchase prescription drugs from pharmacists do not negotiate or bargain with the pharmacist about the suitability of the product."). Every state appellate court that has considered whether to hold

---

3. Ms. Levy–Gray's prescribing physician testified that had Ms. Levy–Gray asked him, he would have given the same advice to take the doxycycline with food or milk if upset stomach occurred when taking it with water only. Of even greater factual significance is the absence of any discussion between Ms. Levy–Gray and the Rite Aid pharmacist regarding her intended additional consumption of atypical amounts of dairy products during the on-going period of time she was taking the medication, over and above a mere glass of milk with each pill.

pharmacies liable under a breach of warranty theory with respect to the operative properties of prescription drugs also has declined to do so. *Id.* citing *Coyle v. Richardson–Merrell, Inc.,* 526 Pa. 208, 584 A.2d 1383, 1387 (1991) (refusing to find pharmacists strictly liable for dispensing defective drugs because "it is not the pharmacist on whom the public 'is forced to rely' to obtain the products they need"); *Presto v. Sandoz Pharmaceuticals Corp.,* 226 Ga.App. 547, 487 S.E.2d 70, 75 (1997), *cert. denied,* ("because the patient is legally deemed to rely on the physician and not the package labeling for [a] warning, [plaintiffs] cannot show they were 'relying on the seller's skill or judgment to select or furnish suitable goods,' as required to prove an implied warranty of fitness for a particular purpose"); *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.,* 361 Pa.Super. 589, 523 A.2d 374, 376–77 (1987) (druggist does not warrant that prescription drugs are fit for "ordinary uses," as use of drug is a decision made by physician); *Bichler v. Willing,* 58 A.D.2d 331, 397 N.Y.S.2d 57, 58–59 (1st Dept.1977) (warranties not implied in sale of prescription drugs, as patient places confidence in doctor's skill, not the pharmacist's skill); *McLeod v. W.S. Merrell Co.,* 174 So.2d 736, 739 (Fla.1965) (a transaction involving a prescription drug "is not one out of which a warranty, even under most modern standards, would be implied"); *Batiste v. American Home Products, Corp.,* 32 N.C.App. 1, 231 S.E.2d 269, 276 (1977), *cert. denied,* 292 N.C. 466, 233 S.E.2d 921 (1977) (a pharmacy is not liable under general warranty principles for injury arising out of a prescription drug because a patient does not rely on the druggist's skill, but instead on his or her physician's skill and advice).[4] Instead, prescription drug sales are

---

**4.** The Majority opinion disregards *In re Rezulin,* and by implication other cases holding similarly, by distinguishing the present case on the basis that the description of how to take the drug was contained in a pamphlet predicated written material edited from other information provided by the drug manufacturer, while in the cases cited above the description relating to the prescription medication was not contained in material attributed to the pharmacy. Majority slip op. at 27. This "distinction" of fact is irrelevant to proper analysis under warranty law, although it may be relevant to analysis under a negligence theory. No

attributable to the advice of the patient's physician. *Id.* Hence, the purchase of prescription drugs is fundamentally different from the purchase of other consumer goods. Because patients generally do not base their decision to purchase a prescription medication on the instructions for its consumption or use or any information contained in the informational pamphlet accompanying the prescription drug, such information is not part of the basis of the bargain, and, therefore, no express warranty is created thereby.

The more appropriate theory of liability under which pharmacies may be held accountable for the instructions for use of a prescription medication is negligence. *See* Restatement (Third) of Torts: Products Liability § 6(e)(2) (1998) (providing that a retail seller of a prescription drug is subject to liability for harm caused by the drug if "at or before the time of sale or other distribution of the drug [ ] the retail seller or other distributor fails to exercise reasonable care and such failure causes harm to persons").[5] The purpose of the theory of liability for breach of an express warranty is not served by applying it to a pharmacy because a pharmacy does not make representations that induce patients to purchase a particular prescription drug. If a pharmacy breaches a duty to the buyer to provide the drug indicated on the prescription or

---

matter the original source of the information, the statement provided by Rite Aid to Ms. Levy–Gray must be analyzed in the first instance to determine whether the statement constituted an express warranty under § 2–313. The cases cited above recognize the proposition that patients typically do not rely on statements provided by pharmacies when deciding to purchase the drug from the pharmacy. Indeed, that was the case with Ms. Levy–Gray. Patients do rely, however, on instructions for use when taking the medication purchased, but a breach of duty there at best presents a question of negligence in tort if the instructions are inaccurate, but not a claim of breach of warranty in contract.

**5.** Even under a negligence theory of recovery, Comment h and Illustration 4 to Restatement (Third) of Torts: Prod. Liab. § 6 notes that courts have limited the tort liability of intermediary parties, including pharmacies, by holding "that they should be permitted to rely on the special expertise of manufacturers, prescribing and treating health-care providers, and governmental regulatory agencies."

supplies inaccurate instructions, then it may be held liable in negligence. In Ms. Levy–Gray's case, she failed to convince the jury that Rite Aid was negligent, an issue not preserved for appeal (although she effectively may have convinced the Majority that Rite Aid was negligent).

The Majority opinion cites, as authorities found persuasive by it for its interpretation of § 2–313(1) that "basis of the bargain" does not require the buyer to be aware of the alleged warranty representation during the negotiation of the bargain, a multitude of cases regarding consumer goods like motor homes (e.g. *Murphy v. Mallard Coach Co.*, 179 A.D.2d 187, 582 N.Y.S.2d 528 (N.Y.App.Div.1992)) and hay-baling chemicals (e.g. *Bigelow v. Agway*, 506 F.2d 551 (2d Cir.1974)), none of which require a prescription by a physician (or anything remotely analogous) in order to purchase. Majority slip op. at 18–22. These cases are not persuasive authority here because we are dealing with the purchase of a prescription medication from a pharmacy, which is a fundamentally different sale of goods. Unlike the buyer of a motor home, for example, who relies upon the affirmations of fact and descriptions by the motor home retailer when making the purchase, a buyer of prescription drugs does not rely upon representations of the pharmacy when deciding to purchase the drug prescribed by a physician. In addition, the instructions for taking the medication (which, even when followed, may not work as intended for each patient's particular condition and diet) indicating to take it with food or milk if upset stomach occurs is quite different from a warranty policy or card that a mobile home is free of defects and which promises to repair or replace the goods.

The Majority opinion also relies on Official Comment 7 to § 2–313, which states:

The precise time when words of description or affirmation are made or samples are show is not material. The sole question is whether the language or samples or models are *fairly to be regarded as part of the contract.* If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance),

the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order (Section 2–209). (Emphasis added).

Majority slip op. at 17–18. Applying this reasoning, I conclude that it would not be fair to regard the instructions for use of a prescription medication as "part of the contract" because it is not the kind of affirmation of fact or description as to the prescription medication that would be a factor in a patient's decision to purchase the medication from the pharmacy. If the patient reads the instructions for use provided by the pharmacy, while standing at the pharmacy counter, and decides that he or she is in doubt and may no longer wish to purchase the medication, the patient more properly would need to return to the prescribing physician to discuss any concerns and possibly obtain a new prescription more suited to his or her particular circumstances.

## B.

Of equal significance to a lack of an express warranty in this case, the record does not support the Majority opinion's conclusion that a reasonable jury could infer that the supposed "express warranty," that the intended operative effects of doxycycline were compatible with milk consumption, was breached. Ms. Levy–Gray took the medication, as directed, twice daily: once in the morning and once in the evening. The instruction stated, in pertinent part, that if stomach upset occurred when using solely water to ingest the pill, then doxycycline may be taken with milk. A reasonable interpretation, indeed the only reasonable construction, of this advice is that you may take each pill accompanied by a volume of milk equivalent to that you would have taken with water, but for the stomach upset. Ms. Levy–Gray, however, consumed an additional, atypical number of dairy servings over the course of each day while on the medication: 8–10 glasses of milk per day, plus one or more of the following dairy products: macaroni with cheese, grilled cheese sandwiches, yogurt, ice cream, and/or cottage cheese. Her consumption amounted to many more servings of milk and dairy products than reasonably

necessary for taking doxycycline twice daily with food or milk as the supposed warranty indicated. The instruction-for-use "warranty" recognized by the Majority did not imply or represent that doxycycline would still be as effective if the patient consumed 9 to 15 servings of dairy products per day. Thus, even if an express warranty was created as the Majority posits, a reasonable jury could not find that it was breached on the facts of this case.

Accordingly, I would reverse the judgment of the Court of Special Appeals and remand the case to that court with directions to reverse the judgment of the Circuit Court for Baltimore County and direct it to enter judgment in favor of Rite Aid Corporation.

Judge RAKER has authorized me to state that she joins in Part A of the reasoning in this dissent and dissents on that basis alone.